Susan WEISSMAN, Plaintiff–Appellant and Cross–Appellee,

v.

CRAWFORD REHABILITATION SER-VICES, INC., a Georgia Corporation, and Crawford & Company, a Georgia Corporation, Defendants–Appellees and Cross–Appellants.

No. 93CA1905.

Colorado Court of Appeals, Div. II.

April 13, 1995.

As Modified on Denial of Rehearing June 8, 1995.

Certiorari Granted March 18, 1996.

Royce E. Tolley, Castle Rock, for plaintiff-appellant and cross-appellee.

Sabey, Johns, Ordelheide & Smith, P.C., Mark L. Sabey, Denver, for defendants-appellees and cross-appellants.

Opinion by Judge CRISWELL.

Plaintiff, Susan Weissman, appeals from the summary judgment dismissing her breach of contract, wrongful discharge, and outrageous conduct claims that she asserted against her former employer, Crawford Rehabilitation Services, Inc., and its successor, Crawford and Co. (collectively, Crawford). Crawford cross-appeals from the court's denial of its request for attorney fees. We affirm in part and reverse in part.

From the information presented to the trial court, it appears that plaintiff was employed by Crawford for a period of approximately 18 months, from July 1988 until January 1990. On her initial employment application and in an application for a bond which she executed in connection with her employment application, she listed three previous employers.

She said that for a period of six years, from 1974 to 1980, she was employed as a secretary to a physician at Denver General Hospital and that this employment ceased when the physician left that hospital. Crawford does not contest the accuracy of plaintiff's description of this employment.

She also said that, from 1985 to 1988, the three years immediately preceding her employment with Crawford, she was employed as the secretary to the president of a private corporation. Her employment with that company ceased when that corporation ceased doing business. Crawford does not contest the accuracy of plaintiff's description of this employment.

In the interim between these two jobs, plaintiff was employed by another employer for a period of approximately five years.

That employment ceased when plaintiff was involuntarily terminated for alleged poor performance and lack of productivity. However, plaintiff disputed this allegation and commenced suit against that employer for wrongful discharge. That suit was settled by the payment of a sum of money to plaintiff and the execution by the parties of a mutual release containing a provision· requiring the parties not to disclose the terms of the settlement. According to plaintiff, that litigation was pending when she applied to Crawford for employment.

In her application to Crawford, plaintiff did not list the former employer with whom she was then involved in litigation. Rather, she asserted that, during this period, she was employed by a concern with which her husband was associated. This statement was true only to a very limited extent, at best. It appears that she may have worked for this firm for two or three hours per week, but, if so, she worked that schedule on only an occasional basis. Nevertheless, she named her husband's associate as a former employment reference and made arrangements with him to provide a favorable reference to prospective employers.

Crawford's supervisor asserted by affidavit that there was some urgency involved in hiring an employee at the time plaintiff made her application, and because plaintiff had provided only an address, not a telephone number, for her immediate past employer, no contact was made with that employer. Likewise, because the physician supervisor had left the employ of Denver General Hospital, that employer was not contacted.

Rather, only the husband's associate was contacted by telephone; he gave plaintiff an excellent recommendation. Based on this recommendation, among other things, plaintiff was hired.

During the period of plaintiff's employment with Crawford, there was in effect an employee's manual, which set forth the grounds and procedure for imposing discipline upon employees. This manual called for a four-step, progressive, discipline program. Thus, an employee was to be provided, first, with a verbal warning, followed by a written warning, a one-day leave, and, finally, discharge.

This manual also provided that, for certain actions, an employee "may" be discharged for a first offense. Among such offenses the manual listed "dishonesty," "false certification or documentation," and "[a]bsence for two (2) consecutive days" without notifying the employee's supervisor.

At some point in the latter stages of plaintiff's employment, she and her supervisor became involved in a dispute over the number or length of her "breaks." As a result, plaintiff contacted the Colorado Division of Labor to lodge an informal complaint.

Finally, in late January 1990, plaintiff was discharged by Crawford. According to a later letter from Crawford, her separation from employment was not made pursuant to the progressive discipline procedure, but was done because plaintiff was absent without leave on the *three* days prior to her termination and did not properly notify her supervisor of her planned absence. Plaintiff asserts, however, that this could not have been the true reason for her termination because her final paycheck was prepared on the *first* day of her absence.

Based upon the foregoing, plaintiff's complaint asserted that her discharge by Crawford was in violation of its manual, entitling her to legal and equitable relief under either an implied contract or promissory estoppel theory. In addition, she asserted that her discharge was the result of Crawford's retaliation against her because of her contact with the Division of Labor. Hence, she sought also to recover for the torts of wrongful discharge and outrageous conduct.

## I. *The Outrageous Conduct Claim*

The trial court dismissed plaintiff's stated claim for outrageous conduct based upon its conclusion that the claim was barred by the exclusivity provisions of the Workers' Compensation Act, § 8–41–104, C.R.S. (1994 Cum.Supp.). Plaintiff asserts that this was error. We disagree.

In her first two claims for relief, plaintiff referred to portions of Crawford's employee manual and alleged that, in terminating

plaintiff's employment, Crawford failed to follow the mandated procedures.

In her third claim, then, she alleged that: *The actions of Defendant in terminating the Plaintiff's employment as described above on the grounds that she had too many unexcused absences,* under circumstances when they [sic] knew such was not the case and that those were not the grounds they [sic] were really terminating Plaintiff, *were outrageous and extreme,* going beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. (emphasis supplied)

It was then alleged that: "As a direct result of Defendant's outrageous conduct *in terminating the Plaintiff's employment,*" she underwent emotional distress, physical suffering, and sustained other damages. (emphasis supplied)

Plaintiff's complaint, therefore, clearly asserted that it was Crawford's act of terminating plaintiff, and not some later action, upon which she was grounding her claim for outrageous conduct. And, contrary to her assertions before this court, plaintiff at no time requested the permission of the trial court to amend her complaint to assert an additional or different claim.

After Crawford submitted its motion for summary judgment, plaintiff in her motion papers asserted that certain statements made by Crawford to federal and state agencies, after plaintiff's termination, also constituted outrageous conduct. Because plaintiff failed to request a pleading amendment, however, it is not clear whether her argument was that Crawford's later actions were merely evidence of its motive at the time of her termination or whether these actions were claimed to be the source of different and separate outrageous conduct claims.

■ In any case, the record demonstrates that the outrageous conduct claim asserted in plaintiff's complaint was barred by the Workers' Compensation Act. *See Montoya v. Local Union III,* 755 P.2d 1221 (Colo.App.1988). *See also Farmer v. Central Bancorporation, Inc.,* 761 P.2d 220 (Colo.App.1988) (act bars assertion of claim based upon intentional infliction of mental suffering arising out of course of employment).

Because plaintiff asserted no claim for outrageous conduct based upon Crawford's post-termination communications to governmental agencies, we need not decide whether such actions can be the basis for an outrageous conduct claim, whether such communications are privileged, or the effect that our affirmance of the trial court's dismissal of plaintiff's pleaded claim might have upon any attempt by her to assert further outrageous conduct claims in the future.

## II. *The Wrongful Discharge Claim.*
### A.

The trial court, although recognizing that there were genuine factual disputes respecting plaintiff's wrongful discharge tort claim, nevertheless concluded that this claim was barred by the so-called "after acquired evidence" rule that had been developed by some federal courts of appeal in passing upon claims asserted under various federal statutes prohibiting employment discrimination. After the trial court rendered its decision in this case, however, the United States Supreme Court announced its unanimous opinion in *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), in which that court concluded that public policy prohibited the after acquired evidence rule from being applied so as to bar such claims.

■ The typical instance giving rise to application of the after acquired evidence rule is one in which the employer terminates the employee for one alleged reason, and as here, the employee sues, claiming that the reason given was pretextual and that the true reason was based upon some improper motive, such as discrimination based on race, gender, or age. During the course of the ensuing litigation, however, the employer discovers that the employee has committed other misconduct (either a misstatement or a failure to disclose on the initial employment application or some other wrongdoing committed after the employment commenced) of which the employer was not aware at the time of the employee's discharge. The issue

presented in these circumstances is the extent to which such unknown misconduct should affect the employee's claim.

In *McKennon v. Nashville Banner Publishing Co., supra,* the Supreme Court rejected the view that such unknown misconduct constitutes a defense to a wrongful discharge claim that is based upon a violation of a federal anti-discrimination statute. However, it outlined the method that is to be used in determining the relief to be granted in such cases.

■ *McKennon* arose under the Age Discrimination in Employment Act (ADEA), but it is clear that its conclusions were not intended to be limited to actions under the ADEA. The court in *McKennon* noted the following:

—The ADEA and other federal anti-discrimination statutes have the dual purposes of deterring illegal acts and of compensating those damaged by such acts;

—Because a private suit under such legislation serves important national policies, it would be inappropriate to apply the equitable doctrine of "clean hands" in such an action;

—Because the employer is liable only if it has acted in an improper fashion and the employee has also acted improperly, as well, it would also be inappropriate to award a "windfall" to either because of the other's misconduct; rather, their interests need to be balanced in such circumstances;

—Hence, the employee's later discovered misconduct should not be a defense to the wrongful discharge claim, but it should be considered with respect to the relief to be granted, subject to the following general rules:

Normally, neither reinstatement of the employee nor front pay should be awarded.

The "starting point" should be an award of backpay from the date of discharge to the date of the employer's discovery of the misconduct.

Such an award, however, can be either increased or decreased, based on the court's consideration of any extraordinary equitable circumstances.

—Finally, these rules for limited relief should be applied only in those instances in which the employer establishes that the employee's undiscovered "wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Publishing Co., supra,* 513 U.S. at ——, 115 S.Ct. at 886–87, 130 L.Ed.2d at 864.

■ The unknown misconduct involved in *McKennon* occurred *after* the employee was hired, and there exists an analytical basis for distinguishing misconduct of this type from a misrepresentation or omission on an employment application (so-called "resume fraud"). However, in *McKennon,* the Supreme Court referred to lower federal court decisions involving both types of misconduct in describing the conflict among the circuits; the opinion makes no distinction between the two types of misconduct; and the rationale of the decision would apply, with substantially the same validity, to both types of misconduct. We conclude, therefore, that the *McKennon* rule is intended to be applied, irrespective of the nature of the unknown misconduct.

■ The question presented here, then, is whether we should adopt the *McKennon* approach for tort claims of wrongful discharge in violation of public policy, based upon employer retaliation against the employee, either for refusing to perform an illegal act, *see Martin Marietta Corp. v. Lorenz,* 823 P.2d 100 (Colo.1992), or for exercising a right or privilege. *See Lathrop v. Entenmann's, Inc.,* 770 P.2d 1367 (Colo.App.1989). This was the question reserved by the division in *Decker v. Browning–Ferris Industries, Inc.,* 903 P.2d 1150 (Colo.App.1995). We conclude that the federal approach should be used in adjudicating state wrongful discharge tort claims.

■ It is true that the *McKennon* rule was promulgated in litigation under a statute specifically prohibiting employee discharges for an improper reason. However, the very considerations which led the judiciary of this state to recognize the tort of wrongful discharge compel the conclusion that the public

policies that are present in such cases are no less important than those that are recognized by legislation. It is no *less* against public policy, for example, to discharge an employee because that employee refuses to commit an illegal act, or because the employee exercises a legislatively-granted right, than it would be to discharge that same employee because of his or her age.

Further, the judiciary's recognition of such a common law claim was surely motivated, at least in part, by a desire to deter future retaliatory acts both by the immediate defendant and by other employers. The judicial recognition of such claims, therefore, has been inspired by the same dual motives, to deter and to compensate, as are inherent in federal and state legislation governing similar improper actions.

We conclude, therefore, that the *McKennon* approach to consideration of misconduct unknown at the time of discharge is equally applicable to a wrongful discharge tort claim under state law. *See Massey v. Trump's Castle Hotel & Casino*, 828 F.Supp. 314 (D.N.J.1993) (applying rule similar to *McKennon* rule to discrimination claim based on state statute); *Preston v. Phelps Dodge Copper Products Co.*, 35 Conn.App. 850, 647 A.2d 364 (1994) (applying rule similar to *McKennon* to state claims for wrongful discharge in violation of public policy and in violation of contract).

 Hence, if plaintiff's claim here properly asserted a wrongful discharge tort claim, the trial court erred in dismissing that claim. Plaintiff's misconduct, unknown to Crawford at the time of her discharge, may be grounds for limiting the type of relief available to her, but it cannot be relied upon as a complete defense to her claim.

## B.

Both the supreme court in *Martin Marietta v. Lorenz, supra,* and earlier decisions from this court, *see Lathrop v. Entenmann's, Inc., supra; Cronk v. Intermountain Rural Electric Ass'n,* 765 P.2d 619 (Colo.App.1988); *Lampe v. Presbyterian Medical Center,* 41 Colo.App. 465, 590 P.2d 513 (1978), have determined that retaliation by an employer for the exercise of an employee right or privilege is actionable under the common law of Colorado, but only if such retaliation would:

> violate a *specific statute* relating to the health, safety, or welfare, or would undermine a *clearly expressed public policy* relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker....

*Martin Marietta v. Lorenz, supra,* 823 P.2d at 109 (emphasis supplied).

 The specific statute referred to need not regulate or limit the employer's rights with respect to the discipline or discharge of its employees; the federal statute relied upon by our supreme court in its *Martin Marietta* opinion did not do so. On the contrary, if the statute limits such rights in some manner and provides a civil remedy for its violation, the statutory remedy provided may supplant any common law remedy that might otherwise be available. *Gamble v. Levitz Furniture Co.,* 759 P.2d 761 (Colo. 1988). The presumption is, however, that there was no legislative intent to modify the common law claim. *See Farmers Group, Inc. v. Williams,* 805 P.2d 419 (Colo.1991).

Crawford argues that there is no "specific statute" or "clearly expressed public policy" authorizing an employee in this state to contact the Colorado Division of Labor to register a complaint about working conditions or, alternatively, that an employee is limited to the remedies established by an order entered pursuant to the Minimum Wage Act, §§ 8–6–101 through 8–6–119, C.R.S. (1986 Repl.Vol. 3B). Hence, it asserts that retaliation against plaintiff for such activity cannot be the basis for a wrongful discharge claim, even if the after acquired evidence rule does not bar its assertion. We disagree.

 The Director of the Colorado Division of Labor has been delegated expansive authority with respect to wages and conditions of employment in this state. The Director not only has authority to "[i]nquire into and supervise the enforcement, with respect to relations between employer and employee, of ... all ... laws protecting the life, health, and safety of employees...." Section 8–1–107(2)(b), C.R.S. (1986 Repl.Vol.

3B). That official has also been granted the unequivocal authority "to ascertain and determine the conditions under which the employees labor" in this state, § 8–1–111, C.R.S. (1994 Cum.Supp.), and this latter authority extends to "every employment" within the state. *Martin v. Montezuma–Cortez School District,* 841 P.2d 237 (Colo.1992).

In addition, the Director has "jurisdiction over any dispute between employer and employee affecting conditions of employment. . . ." Section 8–1–125(1), C.R.S. (1994 Cum.Supp.).

Finally, under the provisions of Colorado's "Minimum Wage Act," the Director has been delegated the power to investigate and ascertain the wages and conditions of employment in various occupations. Section 8–6–107, C.R.S. (1986 Repl.Vol. 3B). In addition, if after such investigation, the Director determines that the conditions of employment in any industry are detrimental to employees' health or morals, the Director, either directly or through a "wage board," may adopt a "wage order," establishing minimum wage rates and standard conditions of employment in such industry. *See* §§ 8–6–109 through 8–6–112, C.R.S. (1986 Repl.Vol. 3B).

 Pursuant to the authority granted by this statute, the Director has adopted "Colorado Wage Order # 19," which applies, among other industries, to the "medical profession industry" and to "medical service occupations." The "medical profession industry" consists of establishments engaged primarily in furnishing medical, dental, surgery, and other health services, while "medical service occupations" refers to performance "of any and every type of *support duties* concerned with or *incidental to* " such medical profession. (emphasis supplied)

This wage order requires, among other things, that the employer in such industries permit employees to take rest periods of at least 10 minutes for every 4 hours, or major fraction thereof, of work. The order also prohibits an employer from discriminating against or discharging any employee "because of participation in any investigation or hearing" relating to the Minimum Wage Act.

Here, plaintiff's allegation is that she contacted the Director to complain about the number or length of her work breaks and that Crawford discharged her for doing so. If those allegations are proven by the evidence, we are convinced that the alleged retaliation is actionable under Colorado law.

We need not decide whether Crawford's employees are engaged in "medical service occupations" within the proper legal interpretation of Wage Order # 19. Indeed, we need not even decide under which of the various statutory grants of power to the Director such contact was authorized. Whether plaintiff's contact might be deemed to be for the purpose of initiating an inquiry into a claimed violation of law under § 8–1–107(2)(b), or to allow the Director to obtain information for the purpose of § 8–1–111, or to have him resolve a dispute under § 8–1–125(1), or to report a suspected violation of Wage Order # 19, is largely irrelevant to the question of the right of plaintiff to make a complaint to the Director.

 The expansive grant of authority to the Director under the various pertinent statutes constitutes a clear expression of public policy that this public office should be the one to receive information, in the form of worker complaints or otherwise, with respect to the conditions of employment in "every employment" in the state. If employers could prevent the receipt of information by the Director by coercing employees who provided such information, the very underlying purpose for the General Assembly's grant of such authority would be frustrated. Hence, employer retaliation against an employee for contacting the Director with respect to that employee's working conditions must constitute the common law tort of wrongful discharge. *See Lathrop v. Entenmann's, Inc., supra* (retaliating against an employee for filing workers' compensation claim undermines purpose of Workers' Compensation Act and gives rise to common law claim).

 Crawford argues, however, that, because Wage Order # 19 prohibits retaliation against an employee and provides that the violation of that order is a misdemeanor, such criminal remedy supplants any existing

common law civil remedy. However, given the expansive jurisdiction granted to the Director by other statutes, we will not infer that the General Assembly intended to grant to him the authority to abolish common law claims of employees who seek to invoke his jurisdiction, even if it be assumed that such authority could lawfully be delegated to him. *See Farmers Group, Inc. v. Williams, supra.*

We conclude, therefore, that the trial court erred in dismissing plaintiff's tort claim based upon allegations that her discharge violated the public policy of this state.

### III. *The Contract and Promissory Estoppel Claims.*

#### A.

Plaintiff's claims based upon breach of an implied contract and promissory estoppel under *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708 (Colo.1987) stand on a substantially different footing than does her tort claim based upon retaliation in violation of public policy. Such claims implicate only private interests, not public concerns. Hence, the considerations that led the court to restrict the use of unknown misconduct as a defense in *McKennon* are simply not presented by such a private claim.

Even so, there is some conflict among the authorities as to the manner in which after discovered misconduct is to be considered. This issue is presented most frequently in cases involving an employee's discharge under a collective bargaining agreement, which requires just cause for such a discharge and which also requires the resolution of any dispute respecting such a discharge to be resolved by an arbitrator.

Labor arbitrators, almost uniformly, refuse to allow the employer to rely upon after discovered misconduct as the basis for justifying the discharge, although they may consider such misconduct in fashioning a remedy for a discharge found to be improper, given the reasons known by the employer at the time. And, this is true even if the misconduct consists of resume fraud. *See* F. Elkouri & E. Elkouri, *How Arbitration Works* 675–677 & 697 (4th ed. 1985).

However, in contrast to these decisions rendered under the terms of a collective agreement, courts applying common law contract principles have treated an omission or misstatement on an employment application as a form of fraud. Hence, under appropriate circumstances, the employer may treat such omission or misstatement as fraud in the inducement, or as creating an equitable estoppel, thereby allowing the employer to rescind the employment agreement and to assert such misrepresentation as a complete defense to any claim of contract breach asserted by the employee.

In *Bazzi v. Western & Southern Life Insurance Co.,* 808 F.Supp. 1306 (E.D.Mich. 1992), *rev'd on other grounds,* 25 F.3d 1047, 1994 WL 252800 (6th Cir.1994) (decision without reported opinion), for example, the court determined that resume fraud could constitute a complete defense to a claim based upon an alleged violation of the employment agreement if (1) the misstatement or omission related to a material fact, (2) it related directly to the evaluation of the application, and (3) it was reasonably relied upon by the employer in hiring the employee. *Accord Massey v. Trump's Castle Hotel & Casino, supra* (applying New Jersey law). *But see Preston v. Phelps Dodge Copper Products Co., supra. Cf. Civil Service Commission v. Lehl,* 108 Colo. 397, 118 P.2d 1080 (1941) (although civil service employee is alien, and therefore not eligible for state employment, he cannot be discharged without compliance with civil service statute).

The *Bazzi* rule recognizes the realities of the circumstances in those instances in which the employer's liability is not based upon a violation of public policy, and we adopt it for application here. Hence, if the three pertinent factors described in *Bazzi* are established, such will constitute a complete defense to an employee's contract or promissory estoppel claim.

Further, unlike the majority's conclusion in *Ice v. Benedict Nuclear Pharmaceuticals, Inc.,* 797 P.2d 757 (Colo.App.1990), we conclude that, because such a defense is similar to a request for rescission of the employment agreement, it is not necessary to prove that the employee's misrepresentation or omission

caused actual damage to the employer in order to establish such a defense.

### B.

In dismissing plaintiff's implied contract and promissory estoppel claims, the trial court applied both the fraud in the inducement and equitable estoppel defenses asserted by Crawford. In doing so, however, it did not specifically consider the three factors described in *Bazzi*, and more importantly, it did not describe the evidence that it relied upon in concluding that there was no genuinely disputed fact that was material to these claims.

▮ The grant of a summary judgment is a drastic remedy, and such relief should be provided only if the moving party presents materials that remove all doubts as to the existence of a genuine factual issue. *Churchey v. Adolph Coors Co.*, 759 P.2d 1336 (1988). Hence, the party against whom summary judgment is sought is entitled to every favorable inference that may be drawn from the historical facts. *Kaiser Foundation Health Plan v. Sharp*, 741 P.2d 714 (Colo. 1987). If differing factual inferences may be drawn from those facts, therefore, summary judgment cannot be granted. *O'Herron v. State Farm Mutual Insurance Co.*, 156 Colo. 164, 397 P.2d 227 (1964); *Sewell v. Public Service Co.*, 832 P.2d 994 (Colo.App.1991).

In addition, because the issue of a party's intent or motivation often requires the drawing of inferences from facts that are otherwise undisputed, such an issue is seldom one that may be resolved on summary judgment. *Hatfield v. Barnes*, 115 Colo. 30, 168 P.2d 552 (1946). Upon such issue, therefore, a self-serving conclusionary affidavit, although not directly disputed, may be an insufficient basis for granting summary judgment. *See Wolther v. Schaarschmidt*, 738 P.2d 25 (Colo. App.1986) (affidavit from defendant that he did not intend for third parties to rely upon his opinion not sufficient in light of inferences that could be drawn from circumstances).

▮ Given the foregoing considerations and in light of our adoption of the *Bazzi* standard, which differs somewhat from the standards applied by the trial court to these claims, we shall reverse the judgment dismissing these two claims and remand the cause for the trial court's further consideration.

In doing so, we should note that we agree that the omissions and misstatements contained on plaintiff's applications, viewed objectively, were both material and directly related to an evaluation of her job application, as a matter of law. However, the question whether Crawford reasonably relied upon any such misstatement or omission must focus on the time that Crawford hired her. This question may involve an issue different from the question whether Crawford would have discharged her at some later date upon its discovery of her misconduct.

### IV. *Crawford's Cross–Appeal*

Given the considerations discussed above, we reject Crawford's assertion that the court was required to assess attorney fees against plaintiff. While we have affirmed the trial court's dismissal of her outrageous conduct claim, we cannot conclude that the assertion of that claim was frivolous, particularly since its factual basis was grounded upon the arguable assertion that Crawford's actions were motivated by a retaliatory intent.

Further, because the other claims asserted by plaintiff will be the subject of further proceedings in the trial court, it would be premature at this point to consider an award of attorney fees with respect to those claims. That subject may be reconsidered by the trial court on remand when it makes a final disposition of the existing claims.

The judgment dismissing plaintiff's claim for outrageous conduct is affirmed; in all other respects, the judgment is reversed, and the cause is remanded for further proceedings consistent with the views set forth in this opinion.

BRIGGS and ROY, JJ., concur.