**CRAWFORD REHABILITATION SERVICES, INC., a Georgia corporation; and Crawford & Company, a Georgia corporation, Petitioners,**

v.

**Susan WEISSMAN, Respondent.**

**No. 95SC451.**

Supreme Court of Colorado,
En Banc.

June 9, 1997.

Kutak Rock, Mark L. Sabey, Melvin B. Sabey, Denver, for Petitioners.

Royce Edward Tolley, Denver, for Respondent.

Holme, Roberts & Owen, LLC, John R. Webb, Adrian Miller, Denver, for Amicus Curiae Colorado Association of Commerce and Industry.

Thomas A. Feldman, Denver, Barry D. Roseman, Denver, Feiger, Collison & King, P.C., Joan M. Bechtold, Denver, Roman & Benezra, L.L.C., John A. Culver, Denver,

Jeffrey Menter, Englewood, for Amicus Curiae Plaintiff Employment Lawyers Association.

Charles T. Passaglia, Denver, for Amicus Curiae Mountain States Employers Council, Inc.

Justice KOURLIS delivered the Opinion of the Court.

This case arises out of the termination of Susan Weissman by her former employer, Crawford Rehabilitation Services, Inc., and its successor, Crawford and Company, Inc. (collectively, Crawford). Weissman sued Crawford alleging causes of action for breach of implied contract, promissory estoppel, outrageous conduct, and wrongful discharge. During the course of discovery Crawford learned that Weissman had made fraudulent misrepresentations on her application for employment with Crawford. In *Weissman v. Crawford Rehabilitation Services, Inc.*, 914 P.2d 380 (Colo.App.1995), the court of appeals concluded that the evidence of Weissman's resume fraud[1] could bar her claims for breach of implied contract and promissory estoppel if Crawford reasonably relied on Weissman's misrepresentations at the time it hired her. However, in reliance upon *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the court of appeals also held that the after-acquired evidence that Weissman fraudulently completed her application for employment could be used as only a limited defense to the claim for wrongful discharge. The court of appeals remanded the claims to the trial court for further proceedings.

We granted certiorari to review certain aspects of the court of appeals opinion. We now adopt the after-acquired evidence doctrine and hold that evidence of Weissman's resume fraud completely bars her claims for promissory estoppel and breach of implied contract. We conclude that Weissman failed

---

1. The term "resume fraud" as used in this opinion applies not only to false and misleading representations on a resume, but also to false and misleading statements on an employment application.

to state a cognizable claim for wrongful discharge and therefore do not reach the scope of the application of the after-acquired evidence doctrine to wrongful discharge claims. We reverse the court of appeals and remand with instructions to reinstate the trial court's decision dismissing Weissman's claims.

## I.

Plaintiff Susan Weissman was employed as a clerical typist by Crawford for approximately eighteen months, from July 1988 until January 1990. On January 25, 1990, Weissman asked permission to take a personal holiday on Monday, January 29. Crawford alleges that this request was in contravention of its policy requiring employees to schedule personal holidays two weeks in advance. Weissman's supervisor denied the request, but Weissman stated her intention to take the day off anyway. On January 26, Weissman was absent from work without permission.

Crawford alleges that on January 26 it made the decision to terminate Weissman based on her insubordination in declaring her intent to take a personal holiday after her request had been denied and her unexcused absence on January 26. Crawford's Denver office requested Weissman's final paycheck on the 26th and the home office in Atlanta issued the check on that date. Consistent with her stated plans, Weissman did not report for work on January 29, and Crawford discharged her when she did return to work on January 30, 1990.

Following her termination, Weissman filed a complaint against Crawford stating causes of action for breach of implied contract, promissory estoppel, outrageous conduct, and wrongful discharge, seeking compensatory and punitive damages.[2] The claims for breach of implied contract and promissory estoppel were based on the assertion that Crawford breached its duty to adhere to

termination procedures set forth in an employee's manual that was in effect during the period of Weissman's employment with Crawford. In the claim for outrageous conduct, Weissman asserted that Crawford's reliance upon too many unexcused absences as a ground for termination was outrageous when in fact Crawford knew that her termination occurred for other reasons.

Weissman's claim for wrongful discharge related to a dispute between Weissman and the manager of Crawford's Denver office, Leonard Francois, regarding the number of breaks Weissman was entitled to take. Weissman believed that in addition to her lunch, restroom, and drink breaks, she was also entitled to rest breaks in the morning and afternoon. After Francois instructed Weissman that she was not entitled to take the rest breaks, Weissman telephoned the Division of Labor of the Department of Labor and Employment (the division) to inquire whether Crawford could eliminate those breaks. Weissman claims that a division representative informed her that Crawford could not deny her the rest breaks. Weissman then notified Francois of her conversation with the division representative and continued to take the rest breaks. There is no information in the record as to when the call or the conversation took place. In her complaint, Weissman alleged that Crawford terminated her in retaliation for her telephone call to the division and that this conduct violated her legal rights and the public policy of the State of Colorado and the United States.

Finally, Weissman alleged that she was entitled to punitive damages because Crawford's conduct was attended by circumstances of fraud, malice, and a wanton disregard for her rights and feelings.

On July 21, 1992, before Crawford responded to the complaint, it deposed Weissman. During that deposition, Crawford discovered that Weissman had made fraudulent

2. Weissman also wrote a letter to Leonard Francois, Crawford's manager in Denver, appealing the termination decision and filed a charge of age discrimination with the Equal Employment Opportunity Commission (EEOC). Crawford's home office upheld the decision to terminate Weissman. The record does not reflect the outcome of the EEOC claim.

misrepresentations on her application for employment with Crawford. Specifically, Weissman admitted that she failed to disclose one of her previous employers, which employer had discharged her and with whom she had been engaged in litigation regarding wrongful termination.

On her application, Weissman listed three previous employers. She indicated that she had worked full-time for the second of the three, Kirk Advertising, during the period from 1980 to 1985,[3] and she listed William Kirkhuff as her supervisor. Weissman then signed the application directly beneath the following statement: "The information I am presenting in this application is true and correct to the best of my knowledge, and I understand that any falsification or misrepresentation herein could result in my discharge in the event that I am hired by Crawford & Company." In addition, as part of the process of applying for a job with Crawford, Weissman was required to fill out an application for a fidelity bond. On the fidelity bond

application, Weissman listed the same three previous employers and indicated that she had never been discharged from any employment.

Prior to hiring Weissman, Crawford contacted Kirkhuff and received an excellent recommendation, but did not contact either of the other previous employers. Based in part on Kirkhuff's recommendation, Crawford hired Weissman.

In her deposition on July 21, 1992, Weissman admitted that, contrary to her representations on the employment and bond applications, from 1980 to 1985 she had worked full-time for the Association of Operating Room Nurses (AORN),[4] and that she was discharged from her employment there. In a subsequent deposition, on August 19, 1992, Weissman admitted that she only worked for Kirk Advertising on a part-time basis, some weeks working there two to three hours and some weeks not working there at all.[5]

In her July deposition, Weissman stated that she did not list her employment with AORN on the application documents because

3. Weissman also provided the names of the two employers for whom she worked from 1974 to 1980 and from 1985 to 1988. Crawford does not contest the accuracy of Weissman's description of her employment during those two periods.

4. In her deposition, Weissman also indicated that she had not worked for Kirk Advertising and that she made arrangements with Kirkhuff to act as a reference for her. Weissman made significant changes with respect to these responses after she received the transcript of her deposition. Her original testimony is indicated below with the changes in parentheses.

   Q: But what was the specific time period that you worked for AORN?
   A: 1980 to 1985, I believe.
   Q: Would you turn to [the employment application]. Does that include AORN?
   A: No, it doesn't.
   Q: Did you work for a Kirk Advertising between 1980 and 1985 or did you work for AORN during that time?
   A: I worked for AORN. (I worked for AORN and Kirk Advertising.)
   Q: So that wasn't accurate?
   A: No.
   Q: You worked for Kirk Advertising?
   A: No. (Yes)
   Q: Why did you put that on there?
   A: Because I was suing AORN.
   Q: You didn't want to give them as a reference?

   A: Yes.
   Q: Who is William Kirkhuff?
   A: My husband's partner.
   Q: Does your husband work for Kirk Advertising?
   A: Yes.
   Q: And did you make arrangements with William Kirkhuff to take any reference calls that were made to them?
   A: Yes. (No arrangements were necessary. I have always worked for Kirk. Every letter, bill, statement and proposal was done by me. I was perfectly justified in giving them as a reference and they were perfectly justified in giving me one.)

5. Weissman testified regarding her relationship with Kirk Advertising as follows:

   Q: When was the first time that you did secretarial work for [Kirk Advertising]?
   A: The last 20 years, I'd say.
   Q: Okay. So about 20 years ago you started doing secretarial work for them?
   A: Yes.
   Q: And you've been continuing to do secretarial work since then for Kirk Advertising?
   A: Yes, I have.
       . . . .
   Q: About how much time did you spend [working for Kirk Advertising]?
   A: I have no idea. I had no reason to keep record of it.
   Q: Well, give me your estimate.

she did not want to give AORN as a reference. In her August deposition, Weissman testified that she did not list AORN as a previous employer because she believed she was prohibited from doing so by the terms of a release she signed with AORN [6] and because she "knew [she] would never get a job if [she] put [AORN] down." [7] Weissman did not testify that she believed that the release prohibited her from truthfully answering the question on the fidelity bond application as to whether she had ever been terminated from prior employment. The only explanation Weissman offered as to why she misrepresented her employment with Kirk Advertising as full-time was because she did not want to list AORN as a reference.

On July 31, 1992, Crawford filed a motion to dismiss. In the motion Crawford argued that the employment relationship between Crawford and Weissman was induced by Weissman's fraud and thereby voidable.[8] Crawford also argued that Weissman could not pursue equitable remedies because she had unclean hands; that she was not entitled to maintain a claim for wrongful discharge because the employment relationship was void; and that her claim for wrongful dis-

charge was not based on a valid public policy. Finally, Crawford argued that none of the actions alleged by Weissman met the threshold test for outrageous conduct. On September 11, 1992, Crawford filed a supplemental brief arguing that the after-acquired evidence of resume fraud barred Weissman's claims. On December 16, 1992, Crawford filed a second motion to dismiss arguing that Weissman's claim for outrageous conduct was barred by the exclusivity provisions of the Workmen's Compensation Act of Colorado.

On September 24, 1993, after considering both of Crawford's motions to dismiss and the briefs in support thereof, as well as Weissman's responses, and the affidavits and exhibits submitted with the briefs,[9] the trial court issued a written order dismissing the claims for breach of implied contract and promissory estoppel on the theories of unclean hands, fraud in the inducement, and the after-acquired evidence doctrine. The trial court also held that the after-acquired evidence doctrine precluded the claim for wrongful discharge. Finally, the trial court found that the outrageous conduct claim did not state a basis for relief.

The court of appeals upheld the dismissal of the claim for outrageous conduct. *Weissman*, 914 P.2d at 384. However, the court of

---

A: *Sometimes it would be two or three hours a week, sometimes it would be nothing.*
. . . .
Q: Did you ever get paid when you were working for Kirk Advertising for the work you did?
A: Not directly, it was usually part of my husband's check.
(Emphasis added.)

6. Following her termination from AORN, Weissman filed a wrongful discharge claim alleging that she had been fired for discriminatory reasons. On May 7, 1987, Weissman agreed to release her wrongful discharge claim against AORN in exchange for $12,500. As a condition of the release, Weissman agreed not to disclose any of the terms of the release to any person other than an attorney including any past, present, or future employee of AORN.

7. Weissman testified as follows:

Q: Okay. And you don't list the Association of Operating Room Nurses on [the fidelity bond application for Crawford], do you?
A: No, I don't.
Q: Why not?

A: Because I was in the midst of a suit with them. I also signed . . . a general release, which I understood meant I wasn't to discuss them in any way, shape or form.
. . . .
Q: . . . [I]s [the general release] the only basis . . . that provides an explanation for why you did not list AORN on your employment application?
A: Well, that *and the fact that I knew I would never get a job if I put [AORN] down* when I was in the midst of a suit with them.
(Emphasis added.)

8. In support of the motion to dismiss, Crawford submitted an affidavit from Leonard Francois, who made the decision to hire Weissman. Francois indicated that he would not have hired Weissman if he had known about her dishonesty in completing the employment and fidelity bond applications.

9. Because the trial court reviewed affidavits and exhibits attached to a motion to dismiss, it properly analyzed the motion under the standards for summary judgment as provided in C.R.C.P. 56. *See* C.R.C.P. 12(b).

appeals concluded that Weissman's complaint properly asserted a wrongful discharge tort claim under state law which, pursuant to the United States Supreme Court decision in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), could not be barred by after-acquired evidence. *Weissman*, 914 P.2d at 385–88.

The court of appeals further held that Weissman's claims for breach of implied contract and promissory estoppel did not implicate public concerns and thus could be barred by resume fraud if: (1) the misstatement or omission related to a material fact; (2) it related directly to the evaluation of the application; and (3) it was reasonably relied upon by Crawford in hiring Weissman. *Id.* at 388. The court of appeals concluded, as a matter of law, that Weissman's omissions and misstatements on the application documents were both material and directly related to an evaluation of her application. *Id.* at 389. However, the court of appeals remanded the case for a determination of whether Crawford reasonably relied upon the misstatements or omissions at the time it hired Weissman. *Id.* We granted certiorari to review certain aspects of the court of appeals decision.[10]

## II.

■ Colorado adheres to the employment at-will doctrine, which provides that an employee who is hired for an indefinite period of time "is an 'at will employee,' whose employment may be terminated by either party without cause and without notice, and whose termination does not give rise to a cause of action." *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo.1987). The at-will nature of the employment relationship is a matter of public policy. However, both the United States Congress and the Colorado General Assembly have created exceptions to the employer's general right to terminate an employee at-will. For instance, several federal statutes provide employees with a private cause of action against an employer for a termination based on discriminatory motives. *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1994) (race, color, sex, national origin, and religion); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213 (1994) (disability); the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621 to 634 (1994); and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1994) (gender). The Colorado General Assembly has also adopted statutory remedies in circumstances where an employee is fired because of disability, race, creed, color, sex, age, national origin, or ancestry. *See* § 24–34–402, 10A C.R.S. (1988 & 1996 Supp.). Other examples of statutory causes of action for wrongful termination enacted by the General Assembly include the termination of an employee for engaging in lawful activity off the premises of the employer during nonworking hours, *see* § 24–34–402.5, 10A C.R.S. (1996 Supp.); termination of an employee for responding to a jury summons, *see* § 13–71–134, 6A C.R.S. (1996 Supp.); and termination of a person employed by a state agency for providing written evidence or testimony before a com-

---

**10.** *The specific issues upon which we granted certiorari are as follows:*

1. Whether Crawford reasonably relied upon Weissman's statements in her application documents regarding her work history.

2. Whether a discharged employee can maintain a claim for backpay where the employment relationship was void *ab initio* due to resume fraud.

3. Whether *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), a case in which the plaintiff was seeking federal statutory remedies and had not engaged in resume fraud, should be followed in a Colorado case involving only state common law claims and defenses, including resume fraud.

4. Whether the court of appeals erred in remanding Weissman's claims of breach of contract, promissory estoppel, and public-policy wrongful discharge.

5. Whether section 8–6–115, 3B C.R.S. (1986), provides the exclusive remedy for an employee allegedly discharged in retaliation for providing testimony and information regarding rest breaks to the Division of Labor.

6. If the retaliation provisions of section 8–6–115, 3B C.R.S. (1986), are not exclusive, whether the court of appeals misapplied the standards adopted by this court in *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo.1992).

mittee of the General Assembly regarding waste of public funds, abuse of authority, or mismanagement of any state agency, *see* § 24–50.5–105, 10B C.R.S. (1988).

■ In addition to the statutory exceptions to at-will employment which limit an employer's unfettered right to terminate an employee, there are certain judicially crafted exceptions. In this case, Weissman does not rely upon any statutory cause of action. Rather, she invokes two judicial exceptions to the employment at-will doctrine. The first exception upon which she relies arises when an employer promulgates an employment manual containing progressive discipline procedures that the employer represents it will follow prior to terminating an employee. An employee originally hired under a contract terminable at-will may be able to enforce such termination procedures under a theory of breach of implied contract or promissory estoppel. *See Keenan,* 731 P.2d at 711–12.

The second exception upon which Weissman relies arises out of *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 105 (Colo. 1992). In *Lorenz,* the plaintiff alleged that he was terminated for refusing to engage in illegal conduct. Concluding that "an employee, whether at-will or otherwise, should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job," we recognized a public-policy exception to the employment at-will doctrine. *Lorenz,* 823 P.2d at 109; *see also Rocky Mountain Hosp. & Med. Serv. v. Mariani,* 916 P.2d 519, 527–28 (Colo.1996) (holding that accountant terminated for refusing to violate professional codes stated cognizable claim for wrongful discharge). Our task in this case is to determine whether Weissman is entitled to relief under either exception, both with reference to the claims themselves and to the after-acquired evidence doctrine.

### III.

#### A.

■ We first review Weissman's claims for breach of implied contract and promissory estoppel. There is no issue raised as to the sufficiency of the claims as pled. However, in response to these claims Crawford asserted the after-acquired evidence doctrine as a complete defense. The after-acquired evidence doctrine shields an employer from liability or limits available relief where, after a termination, the employer learns for the first time about employee wrongdoing that would have caused the employer to discharge the employee. *See Camp v. Jeffer, Mangels, Butler & Marmaro,* 35 Cal.App.4th 620, 41 Cal.Rptr.2d 329, 335 (1995). Where the employee's misconduct consists of resume fraud, the after-acquired evidence doctrine affords an employer a defense if the employer would not have hired the employee if it had known of the fraud. *See Welch v. Liberty Mach. Works, Inc.,* 23 F.3d 1403, 1405 (8th Cir. 1994). "The after-acquired evidence doctrine has its foundation in the logic that an employee cannot complain about being wrongfully discharged because the individual is no worse off than he or she would have been had the truth of his or her misconduct been presented at the outset." *Gassman v. Evangelical Lutheran Good Samaritan Soc'y,* 22 Kan.App.2d 632, 921 P.2d 224, 226 (1996), *aff'd,* 261 Kan. 725, 933 P.2d 743 (1997).

■ Basic principles of law and equity support a rule allowing an employer to avoid liability for breach of implied contract or promissory estoppel claims arising from an employment relationship induced by an employee's fraud. A party that has been fraudulently induced to enter into a contract may rescind the contract to restore the status quo. *See Restatement (Second) of Contracts* § 164 (1981). Applying that axiom, an employer that has been fraudulently induced to hire an employee may rescind the employment agreement. Here, the only agreement that existed was the one contained in the employment manual concerning termination procedures. Hence, the employer is entitled to rescind the implied contract to adhere to the termination procedures contained in the employment manual, and cannot be held liable under a theory of breach of implied contract for failure to adhere to such procedures.[11] *Cf. Massey v. Trump's Castle Hotel*

---

11. Crawford argues that fraud in the inducement allows the employer to undo the relationship

& Casino, 828 F.Supp. 314, 325 (D.N.J.1993) (holding that employer may use after-acquired evidence of resume fraud to avoid liability for breach of an employment contract, if it can show that it had the power to void the contract due to reliance on material misrepresentations, even where the employer was unaware of that power when the breach occurred); Bazzi v. Western & Southern Life Ins. Co., 808 F.Supp. 1306, 1309 (E.D.Mich. 1992) (holding that after-acquired evidence may completely bar a claim for breach of the employment contract because the employer's duty "arises from the contract itself and falls with that contract"), rev'd on other grounds, 25 F.3d 1047 (6th Cir.1994).

■ In addition, we have previously recognized the rule that "he who seeks equity should do equity and come with clean hands." Golden Press, Inc. v. Rylands, 124 Colo. 122, 126, 235 P.2d 592, 595 (1951). An employee who engages in resume fraud does not have "clean hands" and is not entitled to hold an employer liable under a theory of promissory estoppel. See Kiely v. St. Germain, 670 P.2d 764, 767 (Colo.1983) (promissory estoppel is based upon principles of both contract law and equity).

■ Therefore, we begin by recognizing that resume fraud, even when discovered after termination, may serve as a defense to claims of wrongful discharge predicated on contract or equity.[12] The rule announced by the United States Supreme Court in McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), neither governs, nor, in our view conflicts with our holding. In McKennon, Christine McKennon brought a suit alleging that the Nashville Banner Publishing Company (the Banner) discharged her because of

her age, in violation of the ADEA. In discovery, the Banner took McKennon's deposition and learned that during the final year of her employment she removed and copied several confidential documents. The Banner informed McKennon that this misconduct violated her job responsibilities and had the Banner known of this misconduct it would have discharged her at once for that reason. The Banner filed a motion for summary judgment, and, for purposes of that motion, conceded that it had discriminated against McKennon. The district court granted summary judgment for the Banner and the Sixth Circuit Court of Appeals affirmed. The Supreme Court reversed the lower court and held that after-acquired evidence of wrongdoing that would have resulted in discharge does not bar an employee from all relief under the ADEA, but rather only operates to limit damages. McKennon, 513 U.S. at 356, 115 S.Ct. at 883.

The Court emphasized that the ADEA and Title VII share the common purpose of the elimination of discrimination in the workplace. Id. at 358, 115 S.Ct. at 884. Compensation for injuries caused by discrimination under both statutes serves not only to make the victim whole but also to deter future employer misconduct. Id. The private litigant who seeks redress for his or her injuries vindicates individual and societal objectives and "[i]t would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the [ADEA]." Id. Therefore, McKennon provides that claims based on alleged violations of federal employment discrimination statutes cannot be completely barred by after-acquired evidence.[13]

from its inception as though it had never existed. In allowing evidence of resume fraud to be used as a complete defense to a breach of implied contract claim, we are not suggesting that the employment relationship never existed. Rather, we are preventing an employee from using fraud to take advantage of the Keenan exception to employment at-will by allowing the employer to rescind its agreement to adhere to termination procedures contained in an employment manual.

**12.** We limit our holding here to resume fraud and do not address whether after-acquired evi-

dence of post-hire misconduct would be similarly analyzed.

**13.** Although McKennon arose in the context of post-hire misconduct, its holding applies to cases in which an employee's misconduct consists of resume fraud as well. See Wallace v. Dunn Constr. Co., 62 F.3d 374, 378–79 (11th Cir.1995) (holding that "the after-acquired evidence rule announced in McKennon applies to cases in which the after-acquired evidence concerns the employee's misrepresentations in a job application or resume"); Wehr v. Ryan's Family Steak

We conclude that Weissman's breach of implied contract and promissory estoppel claims do not implicate the public-policy interests protected by *McKennon*. In *McKennon*, the Court recognized "societal condemnation of invidious bias in employment decisions" and the existence of an important congressional policy against discriminatory employment practices. *McKennon*, 513 U.S. at 357–58, 115 S.Ct. at 884–885. In her claim for breach of implied contract, Weissman alleges that Crawford made an offer to her by promulgating the termination procedures in the manual; that her continued employment with Crawford constituted acceptance of and consideration for those procedures; and that Crawford was contractually bound to follow the procedures. In her claim for promissory estoppel, Weissman alleges that she is entitled to enforce the termination · procedures because Crawford should have expected her to consider the employment manual as a commitment to follow the procedures; that she reasonably relied on the procedures to her detriment; and that injustice can only be avoided by enforcement of the procedures.

These claims relate to a private contract or promise between an employer and employee and do not raise any public-policy concerns, other than the general interest society has in the integrity of the employment relationship between employer and employee. *Cf. Gassman*, 921 P.2d at 232 ("[I]n ordinary breach of employment actions, there is no overriding governmental interest in preventing breaches to limit the applicability of the after-acquired evidence doctrine."); *Schuessler v. Benchmark Mktg.*, 243 Neb. 425, 500 N.W.2d 529, 541 (1993) ("Breach of a contract does not give rise to the same concerns or demand the same protections as does an action based on discrimination."). Therefore, we decline to apply the limitations placed on the after-acquired evidence doctrine in *McKennon* to claims for breach of implied contract and promissory estoppel, and hold that after-ac-

quired evidence of resume fraud may provide an employer with a complete defense to such claims.

■ We hasten to add that not every misrepresentation on an employment application will allow an employer to avoid liability for breach of contractual or equitable obligations. An employer can rely on after-acquired evidence of resume fraud as a complete defense only if it can prove that the employee's concealment undermined the very basis upon which he or she was hired. This requirement serves the purpose of preventing "an employer from combing a discharged employee's record for evidence of any and all misrepresentations, no matter how minor or trivial, in an effort to avoid legal responsibility for an otherwise impermissible discharge." *Johnson v. Honeywell Info. Sys. Inc.*, 955 F.2d 409, 414 (6th Cir.1992).

■ To assert the defense of after-acquired evidence of resume fraud, an employer must prove that the employee's fraud was material and that a reasonable, objective employer would not have hired the employee if it had discovered the misrepresentation at the outset. The following factors are relevant to that determination. First, would a reasonable employer have regarded the misstated or omitted fact as important? The nature of the misrepresentation and the extent to which it relates to qualifications for the job may bear on this issue. Information about the employer's past conduct or policies may also bear upon this issue by focusing on what the employer regarded as important in a non-adversarial context. *Cf. Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App.4th 620, 41 Cal.Rptr.2d 329, 340 (1995). The second factor is whether the employee concealed or misrepresented the fact or facts with the intent of creating a false impression in the mind of the employer. *Cf. Kopeikin v. Merchants Mortgage & Trust Corp.*, 679 P.2d

---

*Houses, Inc.*, 49 F.3d 1150, 1152–53 (6th Cir. 1995) (applying *McKennon* to case of resume fraud); *Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1108 (5th Cir.1995) (same). This conclusion is supported by the fact that the Supreme Court vacated and remanded two resume

fraud cases for reconsideration in light of *McKennon. See O'Driscoll v. Hercules, Inc.*, —— U.S. ——, 115 S.Ct. 1086, 130 L.Ed.2d 1056 (1995); *Harleysville Life Ins. Co. v. Mardell*, —— U.S. ——, 115 S.Ct. 1397, 131 L.Ed.2d 286 (1995).

599, 601–02 (Colo.1984).[14]

## B.

The relevant facts in this case reflect that Weissman reported on her employment application that she was employed full-time for Kirk Advertising from 1980 to 1985. In her deposition testimony, Weissman admitted that her employment with Kirk Advertising was part-time. More specifically, Weissman stated that some weeks she worked two or three hours a week at Kirk Advertising and some weeks she did not work there at all. In addition, Weissman omitted any reference to her employment with AORN on her application.

On the fidelity bond application, Weissman indicated that she had never been discharged from a job. In fact, she was discharged from AORN. In her deposition, Weissman revealed that she believed she had been terminated from AORN for discriminatory reasons and she had filed a wrongful termination lawsuit against AORN on that basis.

On May 7, 1987, Weissman settled her wrongful termination claim against AORN and signed a release in which she agreed not to disclose any of the terms of the release to any person other than an attorney. In her deposition, Weissman asserted that she omitted AORN on her application for employment at Crawford because she believed she was required to do so by the terms of the release and because she believed she would not find other employment if she disclosed her employment there. The only reason to which Weissman testified as to why she listed Kirk Advertising as a full-time employer was because she did not want to give AORN as a reference.

## C.

Applying the test we have developed to determine whether Crawford is entitled to assert the after-acquired evidence of resume fraud defense on these facts, we conclude that no disputed issues of material fact remain to be resolved and Crawford is entitled to judgment as a matter of law.

Summary judgment is proper where the record establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Persichini v. Brad Ragan, Inc., 735 P.2d 168, 173 (Colo.1987). The party against whom summary judgment is sought is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts. See Jafay v. Board of County Comm'rs, 848 P.2d 892, 900 (Colo.1993). The purpose of the rule for summary judgment is to further the prompt administration of justice, expedite litigation by avoiding needless trials, and enable one to speedily obtain a judgment. See Blain v. Yockey, 117 Colo. 29, 42, 184 P.2d 1015, 1022 (1947).

The first prong of the test is met when all of Weissman's misrepresentations and omissions are taken into account. Weissman did the following: (1) she completely omitted one employer; (2) she misstated the nature of her employment with another employer; and (3) she lied about never having been discharged from a job. A reasonable employer would have considered this deceit to be important.

As to the second prong of the test, according to Weissman's own deposition testimony, she concealed her employment with AORN for two reasons: (1) because Weissman believed that the general release she had signed to settle her claim against AORN

---

**14.** We decline to require that the employer show damage or harm resulting from the misrepresentation. An employment relationship is inherently damaged if it is predicated upon intentional, material fraud. *But c.f. Ice v. Benedict Nuclear Pharm., Inc.* 797 P.2d 757, 760 (Colo.App.1990) (requiring employer to prove damages as an element of defense of fraud in the inducement in the context of a suit by an employee for unpaid wages under an employment contract). We also decline to adopt a separate reliance component of the test. Reliance is incorporated into the inquiry of whether the employer would have regarded the misstated or omitted fact as important. Employment applications are prepared for the employer, and employers are expected to rely upon them in making employment decisions. The employer need not prove that it called every reference, or that it checked on every credential. What it must prove is that a reasonable employer would have regarded the misstatement or omission as important to the hiring decision.

prevented her from disclosing her employment with AORN; and (2) because Weissman believed that she would not obtain employment if she listed AORN as a reference. Accepting as true that Weissman concealed her employment with AORN because she believed that the general release prevented her from disclosing her employment with AORN, the fact remains that Weissman also concealed her employment with AORN to increase her chances of gaining employment with Crawford. By not listing AORN as an employer for fear that it would give her a negative reference, Weissman intended to create a false impression on her application for employment. As such, Weissman's concealment of her employment with AORN meets the second prong for the after-acquired evidence defense in that it shows that Weissman possessed an intent to give Crawford a false impression of her employment background.

Additionally, based on Weissman's own deposition testimony, it is clear that Weissman did not work full-time for Kirk Advertising as she indicated on her application for employment. The only explanation Weissman offered for this misrepresentation was to avoid having to list AORN as a reference. Therefore, it can be inferred that Weissman listed Kirk Advertising as a full-time employer so that she would not have to account for the gap in her employment history from 1980 to 1985. As such, the undisputed facts indicate that Weissman possessed an intent to create the false impression that she had been a full-time employee of Kirk Advertising. These facts provide a separate basis for satisfying the second prong of the after-acquired evidence defense because they indicate that Weissman intended to create a false impression regarding the nature of her employment experience during the period of time she worked for AORN.

In summary, the undisputed facts indicate that Weissman concealed her employment with AORN, in part, because she believed she would increase her chances of gaining employment with Crawford by not listing a negative reference. Additionally, the undisputed facts indicate that Weissman listed Kirk Advertising as a full-time employer,

even though she had only worked for Kirk Advertising on a sporadic basis. Because Weissman's intent may be inferred from her actions and statements, these facts support the trial court's conclusion that Weissman concealed her employment with AORN and listed her employment with Kirk Advertising with the intent to create a false impression on her employment application. *See Kopeikin*, 679 P.2d at 602 (holding that fraud may be inferred from circumstantial evidence). Therefore, the trial court, which considered all the above facts, properly entered summary judgment in favor of Crawford because the after-acquired evidence defense provides a complete bar to Weissman's claims for promissory estoppel and breach of implied contract.

### IV.

We now turn to Weissman's claim for wrongful discharge. In its first motion to dismiss, Crawford argued that Weissman's complaint failed to state a cognizable claim for wrongful discharge. The trial court held that the after-acquired evidence doctrine completely barred this claim and thus did not determine whether the claim was cognizable or not. The court of appeals held that Weissman stated a cognizable claim for wrongful discharge in violation of public policy and that the after-acquired evidence doctrine did not provide a complete defense to this claim. *See Weissman*, 914 P.2d at 386–87. One of the issues upon which we granted certiorari was whether the court of appeals misapplied the standards adopted by this court in *Lorenz* in holding that Weissman stated a claim for wrongful discharge in violation of public policy. Giving Weissman the benefit of all inferences, we conclude that her claim does not state a cognizable cause of action under *Lorenz*.

In *Lorenz*, we acknowledged the public's interest in prohibiting "an employer from placing an employee in the position of keeping a job only by performing an illegal act, forsaking a public duty, or foregoing a job-related right or privilege." *Lorenz*, 823 P.2d at 109. In order to protect this interest, we recognized a public-policy exception to the at-will employment doctrine where an em-

ployee alleged termination for refusing to falsify documents in violation of federal law. *Id.* at 111. Following our decision in *Lorenz*, we held that an employee who alleged termination for refusing to lie on financial reporting documents in violation of a professional code of ethics stated a cognizable claim for wrongful discharge in violation of public policy. *See Mariani*, 916 P.2d at 527–28. Thus, the decisions of this court recognizing cognizable claims under the public-policy exception involved employees terminated for refusing to engage in unlawful or unethical conduct.

In contrast to the employees in *Lorenz* and *Mariani*, Weissman here alleges that she was terminated for exercising a job-related right, not for refusing to engage in unlawful or unethical conduct. Specifically, Weissman alleges that she was discharged because she complained to the division that Crawford was attempting to eliminate her morning and evening rest breaks and because she continued to exercise those breaks.[15] Although an employee terminated for exercising a job-related right may state a cognizable claim for wrongful discharge in violation of public policy under certain circumstances, *see, e.g., Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367, 1372 (Colo.App.1989) (recognizing wrongful discharge claim where employer allegedly discharged employee for exercising right to receive workers' compensation benefits), we conclude that such circumstances do not exist in this case.

The public-policy exception is grounded in the notion that an employer should be prohibited from discharging an employee with impunity for reasons that contravene widely accepted and substantial public policies. Although public-policy wrongful discharge is not subject to precise definition, it has been variously described as an action that involves a matter that affects society at large rather than a purely personal or proprietary inter-

est of the plaintiff or employer, *see Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 878, 824 P.2d 680, 684 (1992); leads to an outrageous result clearly inconsistent with a stated public policy, *see Roberts v. Atlantic Richfield Co.*, 88 Wash.2d 887, 568 P.2d 764, 770 (1977); or "strike[s] at the heart of a citizen's social rights, duties, and responsibilities," *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 15–16, 421 N.E.2d 876, 878–79 (1981). *See generally* 82 Am.Jur.2d *Wrongful Discharge* § 14 (1992). In short, public policy "must concern behavior that truly impacts the public in order to justify interference into an employer's business decisions." *Mariani*, 916 P.2d at 525.

We do not view Weissman's claim that she was terminated for exercising a right either to call the division or to take rest breaks as one that truly impacts the public. Even viewing the claim in the light most favorable to Weissman, we are unable to conclude that fundamental, substantial public policy is at issue.

Weissman suggests that she has a public-policy right to report violations of the Wage Order to the Director of the Division of Labor (director) pursuant to section 8–6–115, 3B C.R.S. (1986). This section provides that an employer may be fined for terminating an employee because the employee "serves upon a wage board, or is active in its formation, or has testified or is about to testify, or because the employer believes that the employee may testify in any investigation or proceeding relative to the enforcement of this article [6]...." § 8–6–115, 3B C.R.S. (1986). Weissman's call to the division did not result in the initiation of an investigation or proceeding by the director. *See* § 8–6–105, 3B C.R.S. (1986) (director shall investigate into conditions of labor at the request of at least twenty-five persons or upon his or her own initiative). Hence, we deem section 8–6–115 to be factually inapplicable.[16]

---

**15.** In her complaint, Weissman claimed that she was terminated because she refused to allow Crawford to eliminate her rest breaks. However, in her response to Crawford's Motion to Dismiss, Weissman stated that "she was terminated not for taking breaks, but for contacting the appropriate governmental authorities about taking breaks."

**16.** Because section 8–6–115 is not applicable to the facts of this case, we decline to address the question of whether the provision in section 8–6–115 authorizing the imposition of a fine is the exclusive remedy for violation of the section thereby precluding a private cause of action for wrongful termination.

Weissman also relies upon a minimum wage order promulgated by the division. *See* 7 C.C.R. 1103–3 (1983), Colorado Minimum Wage Order Number 19 (the Wage Order). The Wage Order provides that employees in certain professions are entitled to at least a ten minute rest period for each four hour work period. Administrative regulations may be sources of public policy in limited circumstances, but those circumstances are not present here. Any interest Weissman may have pursuant to the Wage Order in taking ten minute rest breaks does not rise to the level of a public-policy mandate susceptible to private enforcement.

Not all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment. We must develop the common law in this area with care. The General Assembly is the branch of government charged with creating public policies, and the courts may only recognize and enforce such policies. As we held in *Lorenz*, and restated in *Mariani*, in a claim for public-policy wrongful discharge, the employee must prove that "the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's rights as a worker...." *Mariani*, 916 P.2d at 524 (citing *Lorenz*, 823 P.2d at 109). Here, Weissman does not allege any public health, safety, or welfare concern,[17] and we discern no clearly expressed public policy relating to an employee's basic rights or duties.

Because we conclude that Weissman's claim of retaliatory firing does not set forth a cause of action under *Lorenz*, we do not reach the question of whether after-acquired evidence of resume fraud would completely preclude an employee's action for retaliatory firing in violation of public policy or whether *McKennon* would operate to limit the application of the after-acquired evidence rule.

## V.

We adopt the after-acquired evidence doctrine in the context of resume fraud and hold that this doctrine provides Crawford with a complete defense to Weissman's claims for breach of implied contract and promissory estoppel. We further conclude that Weissman's claim for wrongful discharge in violation of public policy does not state a cognizable cause of action. We therefore reverse the court of appeals and remand with instructions to reinstate the trial court's dismissal of Weissman's claims.

MULLARKEY, J., dissents.

Justice MULLARKEY dissenting:

The majority adopts the after-acquired evidence defense for employers and holds that Susan Weissman's claims for breach of implied contract and promissory estoppel are thus barred. *See* maj. op. at 542–543. I dissent from the majority's conclusion that the approach set forth in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), does not apply to Weissman's breach of contract and promissory estoppel claims. For the reasons I discuss in part I below, I would apply the *McKennon* rationale to all of the claims brought by Weissman.

The majority also finds that Weissman has failed to state a cognizable claim for wrongful discharge in violation of public policy. *See* maj. op. at 543. For the reasons I discuss in part II below, Weissman has alleged a claim of wrongful discharge sufficient to withstand a motion for summary judgment. I therefore dissent from the majority on this issue as well, and I would remand the case for further findings on the wrongful discharge claim.

## I.

### A.

First, I am not persuaded that the traditional contract principle of fraud-in-the-inducement justifies barring an employer from liability because contract theory has not been, and cannot be, strictly applied in the employment context. The majority applies the contract principle that "[a] party that has

---

**17.** Weissman does not allege that she was employed in a position that could implicate public safety concerns if she were not permitted to have a certain number and frequency of breaks.

been fraudulently induced to enter into a contract may rescind the contract to restore the status quo," maj. op. at 547, and, without considering the unique attributes of the employment relationship, summarily concludes that "an employer that has been fraudulently induced to hire an employee may rescind the employment agreement." *Id.* The majority bases its analysis on the fraud-in-the-inducement principle of the *Restatement (Second) of Contracts,* section 164 (1981), but that authority does not address employment at-will contracts. My research uncovered no mention of at-will contracts in the Restatement and no indication that the Restatement was intended to cover this type of dispute. This omission is not surprising in light of the fact that at-will contracts are not truly contracts at all. An at-will contract is a contract devoid of terms, and at-will employees do not have any contract rights. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.21(1), at 478 n. 7 (2d ed.1993).

Strict application of contractual principles is particularly inappropriate for breach of contract or promissory estoppel claims arising from employee handbooks. As the Michigan Supreme Court recognized in *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980), these handbooks do not create contracts in the traditional sense. Although we have applied some basic concepts of contract law in recognizing a handbook's binding effect, there is no "meeting of the minds." *See Toussaint,* 292 N.W.2d at 892. *See also* Richard J. Pratt, Comment, *Unilateral Modification of Employment Handbooks: Further Encroachments on the Employment–At–Will Doctrine,* 139 U. Pa. L.Rev. 197, 208 (1990) (noting that "the doctrines of consideration and mutuality prove fatal to any interpretation of handbook manuals as implied contracts under a traditional analysis").

Specifically, with regard to implied contracts arising from employee handbooks and modification of those handbooks, the Michigan Supreme Court has noted, that "[u]nder circumstances where 'contractual rights' have arisen outside the operation of normal contract principles, the application of strict rules of contractual modification may not be appro-

priate." *In re Certified Question,* 432 Mich. 438, 443 N.W.2d 112, 116 (1989).

There is no doubt that implied contract claims based on employee handbooks are not classic contracts, but rather are hybrids arising from the application of contract and equitable principles, as well as common sense. Handbook promises have been found to be enforceable because of their importance to both employers and employees in governing the workplace, not because they meet the technical definition of contracts. *See generally* Pratt, *Unilateral Modification of Employment Handbooks,* 139 U. Pa. L.Rev. at 208. Given the evolution of the law in this area, it is apparent that this court has not generally applied strict rules of contractual construction to such instruments and should not do so in the circumstances of this case.

I would note that the majority's approach becomes problematic when other "basic principles" of contract law are considered in this context. The concept of contract rescission justified by fraudulent inducement seems much more applicable to contracts involving the sale of goods than to employment contracts. If a sale of goods contract is fraudulently induced, it can be rescinded and the parties restored to the positions they held before entering into the contract. Allowing the employer to declare the contract void *ab initio* logically could lead to a claim by the employer for reimbursement of wages previously paid. Such a result, however, would be highly inequitable given the work completed by the employee and the benefit received by the employer. Moreover, that result would be prevented by the application of federal and state wage laws as well as *quantum meruit.* *See Hansen v. GAB Business Servs., Inc.,* 876 P.2d 112, 114 (Colo.App. 1994).

The majority avoids confronting the difficulties which arise from the logical consequences of rescission by opining that fraud-in-the-inducement is a defense and nothing more. *See* maj. op. at 547 n. 11. Significantly, the majority cites no authority for this proposition. The majority's need to so limit fraudulent inducement merely emphasizes how poorly a strict contract analysis works in this context. What benefit would rescission

be to the employee if Crawford had made a material misrepresentation to induce Weissman to become its employee? The answer is none because rescission benefits only the employer. I therefore find strict reliance on basic contract principles unjustified in this case. Reliance on the defense of fraud-in-the-inducement is nothing but a legal fiction in the employment setting.

In *In re Certified Question*, 432 Mich. 438, 443 N.W.2d 112 (1989), the Michigan Supreme Court addressed a question certified to it by the United States Court of Appeals for the Sixth Circuit. The supreme court was called upon to provide an answer to whether an employer can unilaterally change the policies in an employee handbook which is otherwise legally enforceable as an implied contract. *See In re Certified Question*, 443 N.W.2d at 113. In reaching its affirmative answer, the court stated:

> Without rejecting the applicability of unilateral contract theory in other situations, we find it inadequate as a basis for our answer to the question as worded and certified by the United States Court of Appeals. We look, instead, to the analysis employed in *Toussaint* which focused upon the benefit that accrues to an employer when it establishes desirable personnel policies. Under *Toussaint,* written personnel policies are not enforceable because they have been "offered and accepted" as a unilateral contract; rather, their enforceability arises from the benefit the employer derives by establishing such policies.

*Id.* at 119. I would follow the logic of the Michigan Supreme Court and find that the traditional fraud-in-the-inducement principle of contract law is an inadequate basis for determining the applicability of after-acquired evidence to claims based on an employer's obligation arising from its own handbook.

#### B.

Second, I do not find it persuasive to decline to follow *McKennon* solely because common law claims are not grounded in statute. Simply put, however, that seems to be the basis for the majority's rejection of *McKennon*. The majority states that Weiss-

man's breach of contract and promissory estoppel claims "do not raise any public-policy concerns, other than the general interest society has in the integrity of the employment relationship between employer and employee." Maj. op. at 549. We previously have noted, however, the critical importance of the employment relationship.

In *Decker v. Browning–Ferris Industries,* 931 P.2d 436 (Colo.1997), we discussed the parallels between employment and insurance contracts. We stated that "[a]n employment contract is of even greater significance to an employee because it provides the means for the employee to meet his or her basic needs." *Decker,* 931 P.2d at 444. Justice Herd of the Kansas Supreme Court also persuasively addressed this topic in a concurring opinion. Urging the adoption of the implied covenant of good faith and fair dealing in the performance and enforcement of employment-at-will contracts, Justice Herd stated:

> Employment contracts are the most sensitive of all contracts. They determine the standard of living and the quality of education for children, and affect the general welfare of all the people in this country. It is ludicrous that the covenant of good faith and fair dealing has been adopted pertaining to commercial transactions ... but has not been adopted for transactions involving human working conditions.

*Morriss v. Coleman Co., Inc.,* 241 Kan. 501, 738 P.2d 841, 851–52 (1987) (Herd, J. and Prager, C.J. concurring). Because the employment relationship is of such public importance, I find the majority's distinction of *McKennon* unpersuasive.

#### C.

Third, the *McKennon* approach would best accommodate the realities of the workplace. Far from providing a windfall to an otherwise wrongdoing employee, the Supreme Court's decision in *McKennon* severely limits an employee's remedies. Although the Supreme Court noted that proper remedial relief should be determined on a case-by-case basis, it nonetheless concluded that, as a general rule, neither reinstatement nor front pay is an appropriate remedy in such cases. *See McKennon,* 513 U.S. at 361–62, 115 S.Ct.

at 886. In addition, the Court found that backpay should be limited to the period from the date of the unlawful discharge to the date the after-acquired evidence was discovered. *See id.* at 362, 115 S.Ct. at 886. Because the *McKennon* approach thus seeks to balance the equities of the employer's and employee's wrongdoing by limiting an employee's remedies while still holding the employer liable, such an approach would fairly prevent both parties from benefitting from their wrongdoing. *See id.*

Because employee handbooks inure to the benefit of an employer, that employer gains a double reward if it may freely violate its own policies. The employer enjoys the benefits both of having a policy and of having the ability to violate that policy without facing liability. As the Michigan Supreme Court stated in *Toussaint,*

> While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel polices and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation."

292 N.W.2d at 892 (citations omitted).[1] And, as the South Carolina Supreme Court recognized in *Small v. Springs Industries, Inc.,* 292 S.C. 481, 357 S.E.2d 452, 454–55 (1987),

> [There are] strong equitable and social policy reasons militating against allowing employers to promulgate for their employees potentially misleading personnel manuals while reserving the right to deviate from them at their own caprice.... It is patently unjust to allow an employer to couch a handbook, bulletin, or other similar material in mandatory terms and then allow him to ignore these very policies as a gratuitous, nonbinding statement of general policy whenever it works to his disadvantage. Assuredly, the employer would view these policies differently if it were the employee who failed to follow them.

*Small,* 357 S.E.2d at 454–55 (internal quotation marks and citations omitted).

By failing to adopt the *McKennon* approach to Weissman's common law claims, the court unduly punishes the employee, while allowing the employer to completely avoid its self-imposed "obligation." Under the majority's holding, a wrongdoing employer is immunized by an employee's resume fraud even though that fraud had nothing to do with the employer's reason for terminating the employee. It becomes a shield to protect the employer from the consequences of its own misconduct. But as the California Court of Appeal recognized in refusing to adopt after-acquired evidence as an absolute bar to liability,

> [n]either sound public policy nor the general law of contract dictates that an employee who can show that despite loyal and competent service he was fired without cause, in violation of a term of his employment contract—or because of his age, in violation of statute—nonetheless has forfeited all resulting legal remedies against his employer because of material misrepresentations he made years earlier in his employment application. Although resume fraud is a serious social problem, so is termination of employment in violation of antidiscrimination laws or in breach of contract.

*Cooper v. Rykoff–Sexton, Inc.,* 24 Cal. App.4th 614, 29 Cal.Rptr.2d 642, 645 (1994).

---

1. We found the *Toussaint* rationale compelling in *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708 (Colo.1987). Indeed, it was key to the *Keenan* discussion. *See Keenan,* 731 P.2d at 710–12.

### D.

Finally, the majority's decision fails to recognize the after-acquired evidence defense in employment cases for what it is: a novel theory of recent invention with no historic roots. While the majority places little weight on the rationale of the *McKennon* opinion, noting that the *McKennon* opinion does not govern this court's decision, *see* maj. op. at 548, it fails to apply similar scrutiny to the very defense which the *McKennon* rationale was developed to address. The after-acquired evidence defense was developed in federal courts by employers seeking to defend against claims brought by employees alleging that they had been terminated in violation of a federal statute such as Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e–2000e–17 (1994 & Supp. I 1995). *Summers v. State Farm Mutual Auto. Insurance Co.,* 864 F.2d 700 (10th Cir.1988), was the leading case to adopt this theory of defense, and it was decided less than ten years ago. *See Mardell v. Harleysville Life Ins. Co.,* 31 F.3d 1221, 1221 (3d Cir.1994) (stating that the after-acquired evidence rule was "pioneered by the Tenth Circuit Court of Appeals in *Summers* "); Jonathan T. Hyman, Note, *Removing the Effect of Disclosures From Federal Employment Discrimination: Stripping Away the Last Vestiges of the After–Acquired Evidence Doctrine,* 47 Case W. Res. L.Rev. 117, 123–24 (1996) ("The seminal case in defining this doctrine and its role in employment discrimination litigation was *Summers v. State Farm Mutual Automobile Ins. Co.*").

If this court recognizes this novel defense, it should recognize the need for a novel remedy. Viewing the after-acquired evidence defense as a matter of first impression,

I would apply the *McKennon* analysis as a balanced approach to that defense regardless of the claim against which the defense is asserted. The majority reads *McKennon* as being dependent on the high public purpose being served by the federal statute at issue in *McKennon. See* maj. op. at 548. Because the majority finds that Weissman's breach of contract and promissory estoppel claims do not implicate the "public policy interests protected by *McKennon,*" it concludes that the after-acquired evidence may serve as a complete bar to those claims. *See id.* at 549. This conclusion is based on a misreading of *McKennon* and a failure to give sufficient weight to the singular value most people place on their employment relationship. *See e.g., Decker,* 931 P.2d at 444; *Morriss,* 738 P.2d at 851–52.

*McKennon* emphasized the important public policy underlying the Age Discrimination in Employment Act[2] because that was the case before it. It had no occasion to address state common law claims such as those now asserted by Weissman.[3] By its ruling in *McKennon,* the Supreme Court overruled decisions like *Summers* and its progeny which had applied the after-acquired evidence defense in a draconian form to defeat completely employee claims based on alleged violations of federal statutes. For the reasons I have stated above, I would adopt the *McKennon* rationale for state common law claims as well.

### II.

The majority holds that Weissman has not stated a cognizable claim for wrongful discharge in violation of public policy. *See* maj. op. at 552. Weissman alleges that she was

---

2. 29 U.S.C. §§ 621—634 (1994 & Supp. I 1995).

3. *Cf. Duart v. FMC Wyoming Corp.,* 72 F.3d 117, 120 (10th Cir.1995). In *Duart,* the Tenth Circuit Court of Appeals considered whether to affirm a summary judgment for the employer on an employee's state law claims including breach of contract and promissory estoppel. The court stated that:
     We are uncertain whether Wyoming would adopt the rationale of *McKennon* and hold that a terminated employee's claims for breach of contract and promissory estoppel ... are not totally barred because the employer later dis-

covers material misrepresentations in the employee's resume and application which would themselves justify termination. Such being the case, we will consider on their merits Duart's claims....
*Duart,* 72 F.3d at 120. Reviewing the district court's determination that the employer was entitled to summary judgment based on the merits, the court of appeals affirmed the summary judgment without reaching the issue of the application of after-acquired evidence to breach of contract and promissory estoppel claims. *See Id.*

terminated for contacting the Division of Labor regarding her rights as a worker to take certain breaks. The majority, however, states that it does "not view Weissman's claim that she was terminated for exercising a right either to call the division or to take rest breaks as one that truly impacts the public." Maj. op. at 552. I dissent from the majority's decision on this issue because the very right to inquire about one's protected rights without fear of retaliation is an important public policy concern.

An employee states a claim for wrongful discharge in violation of public policy where the employee has been terminated for exercising "an important job-related right or privilege," and the employer's action "undermine[s] a clearly expressed public policy relating to ... the employee's right or privilege as a worker." *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo.1992). The majority cautions that "[n]ot all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment." Maj. op. at 553. However, the majority appears to confuse Weissman's right to inquire about her statutory and administratively protected rights as a worker with the statutory and administrative rights about which she seeks information.

The majority determines that the right to report violations of the Wage Order to the Director of the Division of Labor pursuant to section 8–6–115, 3B C.R.S. (1986), is not implicated because Weissman's call to the Division did not lead to an investigation, and that Weissman's potential right to rest breaks pursuant to Colorado Minimum Wage Order Number 19, while an administrative regulation, "does not rise to the level of a public-policy mandate susceptible to private enforcement." Maj. op. at 553.

Weissman alleges that she was fired for contacting the Division of Labor about her rights to breaks. Whether she actually has the rights about which she inquired is irrelevant to the issue of her right to inquire about those protections without fear of retaliation. I disagree with the majority's conclusion that "Weissman's claim that she was terminated for exercising a right either to call the division or to take rest breaks [does not] truly

impact[ ] the public." Maj. op. at 552. In my opinion, deterring employers from "discharging an employee with impunity," *id.* at 552, for seeking information from a public agency about her rights as a worker is a "widely accepted and substantial public polic[y]," *id.*, which "affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer." *Id.* The Division of Labor is part of the state government, and it exists to serve the public by enforcing certain state and federal laws. If an employee can be fired in retaliation for attempting to find out about her rights as a worker, the rights about which she inquires are rendered useless. Therefore, in my opinion, an employee's right to seek information about her legally, statutorily, or administratively protected rights as a worker without fear of being terminated with impunity is of sufficient gravity to state a claim for wrongful discharge, and I respectfully dissent from the majority on this issue.

### III.

Because I do not find the majority's distinction between statutorily rooted public policy claims and state common law claims in the employment context to be persuasive, I dissent from its determination that after-acquired evidence may bar Weissman's breach of contract and promissory estoppel claims. In addition, I disagree with the majority's decision finding that Weissman has not stated a cognizable claim for wrongful discharge in violation of public policy. In my opinion, an employer's retaliation against an employee for seeking information about her legally, administratively or statutorily protected rights as a worker is of sufficient public concern to state a cognizable claim for wrongful discharge in violation of public policy. Thus, I respectfully dissent from the majority's opinion.