# IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

|                                              |     |                        |
| -------------------------------------------- | --- | ---------------------- |
| DONNA ROBINSON,                               | )   |                        |
|                                              | )   |                        |
| Plaintiff,                                    | )   |                        |
|                                              | )   |                        |
| v.                                           | )   | C.A. No. N24C-11-037 CEB |
|                                              | )   |                        |
| KELLY CABLE OF N.M., LLC,                     | )   |                        |
| a/k/a KELLY CABLE OF NEW                      | )   |                        |
| MEXICO, LLC, PEAK                             | )   |                        |
| UTILITY SERVICES GROUP                        | )   |                        |
| INC., and IX CAPITAL PEAK                     | )   |                        |
| HOLDINGS, LLC,                                | )   |                        |
|                                              | )   |                        |
| Defendant.                                    | )   |                        |

Submitted: November 11, 2025
Decided: December 8, 2025

## <u>**MEMORANDUM OPINION**</u>

*Upon Consideration of Plaintiff's Motion for Summary Judgment:*
**GRANTED**.

Daniel C. Herr, LAW OFFICE OF DANIEL C. HERR LLC, Wilmington, Delaware. *Attorney for Plaintiff*.

Ronald N. Brown, III & Daniel P. Klusman, DLA PIPER LLP, Wilmington, Delaware; Michael W. Massiatte, DLA PIPER LLP, Dallas, Texas; Jessica F. Daneshvar, DLA PIPER LLP, New York, New York. *Attorneys for Defendants*.

**BUTLER, R.J.**

## I. FACTUAL BACKGROUND

Peak Utility Services Group, Inc. is the parent company of subsidiary Kelly Cable Company of N.M. LLC ("Kelly Cable").[1] Together with IX Capital Peak Holdings, LLC ("Capital"), they are the Defendants in this action, brought by the former president of Kelly Cable Company, who seeks compensation under her employment agreement.

Plaintiff Donna Robinson was hired by Kelly Cable in 2013.[2] She was eventually given the job of president in 2021. When she assumed the presidency, the parties entered into an Employment Contract, a copy of which is appended to the Complaint.[3] One feature of the Employment Contract was its inclusion of the terms of severance from Robinson's employment with Kelly Cable. The severance provisions are why we are here, so they are worth a look at the outset.

If Robinson was terminated through no fault of her own – "without cause" – she was to continue to receive her annual salary for another year, provided she executed a "General Release" in favor of the Company.[4] In addition, the Company would pay her COBRA insurance premiums for another year.[5] If she was terminated

---

[1] Ryan Polk Aff., D.I. 19, ¶1.
[2] Compl. ¶7.
[3] Compl., Ex. A.
[4] *Id.*
[5] *Id.*

2

"for cause," she would be paid only until her termination date, and she would have to pay any COBRA premiums herself.[6]

The General Release that had to be executed in order to receive severance payments is a significant feature in this dispute. A copy of a draft General Release was included as an exhibit to Robinson's initial Employment Contract. The Employment Contract provided that no modification of the draft General Release was permitted except for "any changes to such form as either party may reasonably require to reflect the circumstances relating to the termination of Your employment and/or changes in applicable law."[7]

Separately from the Employment Contract, Robinson was the recipient of "P units" in IX Capital Peak Holdings.[8] P units appear to represent an entitlement to share in the profits of Capital and were distributed to managers and executives. Robinson received 40,000 units in 2018 and an additional 500,000 in December 2021, presumably when she became president of Kelly.[9] The LLC agreement by which these units were awarded provided that if she was no longer employed by Kelly, Capital could repurchase the units.[10] If Capital did not elect to repurchase the

---

[6] *Id.*
[7] *Id.*
[8] Compl. ¶12.
[9] *Id.*
[10] Ryan Polk Aff., Ex. B.

3

units, they could nonetheless have value in the event of a sale of Capital.[11] If she was terminated without cause, Capital could repurchase the units at fair market value. If she was terminated for cause, Capital could repurchase the units for the lesser of 1) the fair market value and any capital contribution made or 2) the purchase price paid for the P shares – presumably zero.[12]

On January 31, 2023, Robinson was informed that her employment with Kelly Cable was ending, effective immediately.[13] She was informed this was due to a restructuring and it was not "for cause." Thus, the "without cause" separation provisions of her Employment Contract were triggered.

But at this point, Kelly Cable made things complicated. Robinson was presented with a "Severance Agreement" that provided her continued salary for one year and that the Company would pay her COBRA premiums for one year, both proper "without cause" provisions. But the Severance Agreement also included a new provision that she forfeit all of her P units in Capital.[14] In case there was any doubt, the "re" line of the Severance Agreement conveying all of this was "Separation and Forfeiture."

---

[11] Pl.'s Letter Regarding Opp'n to Defs.' Disc. Protocol at 4-5.
[12] Ryan Polk Aff., Ex. B.
[13] Compl. ¶17.
[14] Compl., Ex. B.

Plaintiff's P units in Capital are not even mentioned in her 2021 Employment Agreement. Capital is nowhere identified as her employer. But most surely, Paragraph 3 of the Severance Agreement tendered to her in January 2023 required her to agree that "no consideration will be given to you for the cancellation and forfeiture to the Company of the Forfeited Interests."[15]

The Severance Agreement then appended a General Release that changed some of the terms from the earlier General Release attached to her initial Employment Contract. For example, it included a proviso that the General Release was an agreement to all of the terms in the "Severance Agreement" she was being asked to sign on January 31, 2023, which included the forfeiture of the P units noted above. Moreover, the new General Release released not only Kelly Cable and Peak Utility Services – as called for in the original General Release – but also "its affiliates, subsidiaries and direct or indirect parent entities and all present, former and future directors, officers, agents, representatives, employees, successors and assigns of the Company and/or its affiliates, subsidiaries and direct or indirect parent entities."[16] In other words, she was being asked to release Capital from any responsibility concerning the P units as a new condition precedent to receiving the severance benefits promised in her Employment Contract.

---

[15] *Id.*
[16] *Id.*

## II.    PROCEDURAL HISTORY

Plaintiff filed her Complaint in this Court and Defendants answered.  In their Answer, Defendants admitted that they terminated Robinson without cause.[17]

There followed a motion for summary judgment by the Plaintiff, arguing that Defendants breached the Employment Contract by failing to tender to her a General Release that was in "substantially similar form" as the General Release in the Employment Contract because requiring her to forfeit her P units was a material change, not required by existing law.[18]  Plaintiff also argued that any suggestion that the basis for her termination could later be changed to "for cause" due to after acquired evidence of misconduct was too little, too late as Defendants had already materially breached the agreement by not tendering a proper General Release.[19] Finally, Plaintiff pointed out that the employment agreement regarding COBRA benefits was not contingent on signing a General Release and her right to Defendants' payment of those premiums was complete upon her termination without cause.[20]

---

[17] Defs.' Answer ¶17.
[18] Pl.'s Mot. Summ. J. ¶¶19-22.
[19] *Id.* ¶¶23-25.
[20] *Id.* ¶26.

Defendants responded to Plaintiff's motion by arguing that summary judgment was premature as discovery had not been taken. They included an affidavit of Defendants' Delaware counsel, alleging that the "factual record is not sufficiently developed" for summary adjudication.[21] For example, Defendants said "[t]his Court has no factual record regarding these P Units' importance or monetary worth and their significance to Plaintiff when negotiating the Proposed Separation Agreement."[22]

The Court asked Defendants to further explain what discovery was needed. Defendants supplemented their pleading with a general outline of discovery concerning 1) the track of the parties' post termination negotiations over the final separation agreement, 2) the value of the P units and their importance in the severance agreement, and 3) Plaintiff's possible misfeasance in office, justifying a change in position regarding cause for her termination.[23]

The Court then entered an Order expressing that Defendants had not succeeded in convincing the Court that there were material facts in dispute for which

---

[21] Daniel P. Klusman Aff., D.I. 8, ¶7.
[22] Defs.' Opp'n Mot. Summ. J. at 4.
[23] Defs.' Letter Regarding Disc. Protocol, D.I. 15.

7

discovery need be taken before summary adjudication, but out of an abundance of caution, the Court gave Defendants another opportunity to demonstrate their point.[24]

Defendants responded with an affidavit by the general counsel to Defendants Peak Utility and Kelly Cable.[25] In this affidavit, the attorney explains that he and Plaintiff had negotiations over the terms of the Separation Agreement, none of which are terribly germane, since the Separation Agreement apparently always included a forfeiture of Plaintiff's P units and did not result in a final agreement anyway.[26]

The affidavit did, however, outline at least a suggestion of malfeasance by the Plaintiff.[27] It referenced an incident in 2018 when Robinson was the Chief Human Resources Officer for Kelly Cable. Counsel says a Kelly Cable employee was involved in an accident that resulted in a lawsuit. Counsel relates that when asked about the incident, Robinson claimed to know nothing, but the driver had in fact committed a "serious violation of company policy" and Robinson withheld this information from the Company.[28] This, according to the affiant, could have been just cause for Robinson's termination had Defendants known about it.

---

[24] D.I. 18.
[25] Ryan Polk Aff.
[26] *Id.* ¶¶9-29.
[27] *Id.* ¶¶14-17.
[28] *Id.* ¶16.

This pleading led to a final round of letter briefing from Plaintiff and Defendant; the Court has heard enough. The summary judgment question is ripe for decision.

## III. ANALYSIS

When asked by the Court to provide further explanation why summary judgment for Plaintiff is improper, Defendants allege four material issues of fact.[29] The somewhat extended discussion of the allegations above, supported by contract documents, affidavits and exhibits, demonstrates that while there may be disputes around the edges, they amount to quibbling: the fundamental facts determinative of the action are clear and not in doubt.

### A. The Company breached the Employment Agreement by tendering a General Release that was not in substantially the same form as the Exhibit to the Employment Contract.

The primary issue on this Motion is whether the General Release tendered to Robinson upon her termination is in substantially the same form as the one appended to the 2021 Employment Contract that made Robinson president of Kelly Cable. The Employment Contract was a well-crafted document. Of course, one of the reasons parties work out these severance agreements at the outset of employment is to avoid the very type of dispute we have here.

---

[29] Defs.' Letter Regarding Issue of Material Facts, D.I. 19.

Not only were the consequences of "for cause" and "without cause" termination considered, but confidentiality, non-competition, and non-disparagement were all covered in the event of Robinson's termination. In order to qualify for one year of additional salary following her termination, the Company mandated that a condition precedent to receipt was signing a General Release.

When the Company told Robinson she was being let go without cause, the provisions of the Employment Agreement concerning her former employment status were activated. She was immediately entitled to payment of COBRA insurance premiums by the Company and, if she signed a General Release in the form appended to the Employment Agreement, to an additional year's pay. The Company had a duty to give her a General Release substantially in the form as appended to the Employment Agreement except for changes "either party may reasonably require to reflect the circumstances relating to the termination of Your employment and/or changes in applicable law."

The Separation Agreement and General Release given to Robinson on January 31, 2023 when she was terminated was a dramatically different agreement. It required that she forfeit her equity units in Capital, a provision that appears nowhere in the Employment Agreement of 2021. The Company has not even argued that the new provision was attributable to the circumstances relating to her termination or a

change in applicable law. And the General Release released far more entities than Peak Utility and Kelly Cable.

Because the Company presented a General Release that altered the rights Plaintiff was expected to release as part of her severance, the Company breached the Employment Contract. The Company has presented no basis in either law or fact upon which to justify its failure to follow the terms of the Employment Contract and effectively thwarted Plaintiff's right to severance payments.

### 1. The Company had no right to envelope Capital's P units in the Severance Agreement.

Defendants do not dispute that Plaintiff was the owner of 540,000 P units of IX Capital. Capital was not even a party to the Employment Contract or the appended draft General Release. Plaintiff's ownership interest in the P units was governed by Capital's separate LLC agreement, a copy of which is in the record.[30]

P units in Capital were apparently a class of units intended to benefit employees favored by the managers of the "Capital Group" of companies.[31] Capital had provisions for repurchasing units from employees who left the Capital Group of companies, spelled out specifically in Article 11 of the LLC Agreement.

---

[30] Ryan Polk Aff., Ex. B.
[31] *Id.* §3.03.

While Capital is an affiliate of Peak Utility and Kelly Cable, the entities are separate, and the Court presumes that is for a reason. Defendants have proffered no basis for Peak Utility and Kelly Cable to use their leverage over Plaintiff's lawful, legitimate, and bargained for severance payments under her Employment Contract to attempt to alter the separate rights of Plaintiff and Capital concerning her P shares.

    2. *Plaintiff's right to COBRA premiums was not dependent on signing the General Release – it was complete upon her termination without cause.*

Perhaps it is but a footnote in the dispute, but Plaintiff is correct in pointing out that her signing the General Release was not a condition precedent to her receipt of COBRA premium payments.[32] Nonetheless, Defendant withheld those payments, only furthering the appearance that the Company was holding any severance payments to Robinson hostage to her signing an agreement that improperly required her to forfeit her P units in Capital.

**B. Trying to negotiate a settlement with a party in breach is not a waiver of the right to assert the breach in a lawsuit.**

Defendants next argue that discovery is needed on Robinson's post-termination discussions with the Company concerning other provisions of the Severance Agreement. Defendants allege such discovery will show that Plaintiff did

---

[32] Compl., Ex. A at 5-6.

12

not consider the value of the P units a material matter and that Plaintiff's negotiation of the Severance Agreement was a waiver of the requirement that the General Release be in substantially the same form.[33]

Defendants rely on a New York decision to support their argument that Plaintiff somehow waived her complaint. *Mullinix v. Mount Sinai School of Medicine* was a lawsuit filed by a doctor at Mount Sinai, one claim being breach of her employment contract.[34] As a condition of receiving severance payments, the contract required the doctor to execute a release, which according to the doctor, contained material terms not included in the original employment agreement.[35] However, Mount Sinai explicitly offered to negotiate the terms.[36] The doctor never informed Mount Sinai that she believed the new terms to be a breach, nor did she make any effort to negotiate.[37] She instead filed a multi-count lawsuit alleging various civil rights violations as well as breach of the employment contract.[38]

Assuming New York law is not inconsistent with Delaware's view on such matters, that is not this case. Defendants agree that the parties engaged in months of negotiation prior to the filing of this suit. If there is some duty on the part of the

---

[33] Defs.' Letter Regarding Issue of Material Facts.
[34] 2015 WL 328050 (S.D.N.Y. Jan. 23, 2015).
[35] *Id.* at *3.
[36] *Id.* at *4.
[37] *Id.*
[38] *Id.*

13

employee to negotiate what the Company did not present as a negotiable document – a proposition the Court does not adopt – Defendants have not shown any evidence that Plaintiff was unwilling to do so.

Pointing to Delaware contract law, Defendants claim that Robinson's negotiations indicate a willingness to perform despite the alleged breach by Kelly Cable, thus excusing Defendants' breach.[39] The facts indicate otherwise. The emails and references to conversations between Defendants' general counsel and Robinson demonstrate that Robinson was aware of the issue with the P units, repeatedly discussed the issue with Defendants' counsel and even revised the Separation Agreement herself to retain her rights to the P units.[40] Such behavior does not indicate that the P units were immaterial to Robinson or that she excused Defendants' performance.

In any event, Defendants have proffered nothing to suggest that there was ever a deal that included forfeiture of Plaintiff's P units. Discovery over a settlement that did not happen is immaterial. Defendants' protestation now that they were willing

---

[39] Defs.' Letter Regarding Issue of Material Facts.

[40] An email from Defendants' general counsel explicitly mentions "an update on the P Units." Ryan Polk Aff., Ex. F. An email sent by Robinson a few months later references a May 12th discussion about her vested shares and repeated attempts to wrap up the matter, including a revised copy of the Separation Agreement that states "You will retain your rights to these shares, but agree to sell the shares at fair market value as may be agreed between the parties." Ryan Polk Aff., Ex. G.

to negotiate the terms is belied by their litigation position. They are welcome to settle this dispute whenever it suits them. They are not welcome to force Plaintiff into months of expensive litigation discovery over issues that are not material to the dispute.

## C. The Relevance of After Acquired Evidence

Finally, Defendants seek discovery as to whether Robinson can be terminated "for cause." In arguing that there are material issues in dispute, Defendants reference an incident in 2018 involving a truck driving Kelly Cable employee who violated a company policy for whom, it is inferred, Robinson helped cover up.[41] Defendants say they learned of this in June 2023, about six months after Plaintiff was terminated.

There is also a reference to a civil lawsuit filed in August 2025 (the "Bermudez" action) in which two former employees allege wrongful/retaliatory discharge, claiming whistleblower status and various wrongdoing at Kelly Cable that they reported when Robinson was president.[42] They also allege that these wrongs were brought to the attention of "senior leadership at Peak Utility Services Group, parent company of Kelly Cable, but no corrective action was taken."[43] So, the

---

[41] Ryan Polk Aff. ¶¶13-16.
[42] *Id.* ¶¶20-21.
[43] *Id.*, Ex. H.

argument goes, perhaps there is/was a basis to terminate Robinson for cause, thus severely limiting her rights to severance payment or the value of the P units.

It is noteworthy that none of this was raised in Defendants' Answer to the Complaint. Nor was it raised in their response to Plaintiff's motion for summary judgment. The first word of any of it came when the Court indicated that Defendants' claims of "material facts in dispute" were weak and gave Defendants an opportunity to amplify why they needed discovery.

While decisions in Delaware concerning the "after-acquired evidence doctrine" are few, they seem to center in the Chancery Court, where fiduciaries who alleged to have breached their duties seek the advantages of an employment contract notwithstanding their wrongdoing.[44] As the Chancery Court has said, "the after-acquired evidence doctrine applies all the more persuasively in this setting, where a faithless fiduciary . . . concealed the wrongdoing that could have supported a for-cause termination. If the after-acquired evidence doctrine did not apply, then the faithless fiduciary would benefit from his wrongful acts."[45]

Defendants' last-minute pleadings do not suggest a faithless fiduciary. Rather, they suggest Robinson withheld some information from the general counsel

---

[44] *See, e.g.*, *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022); *Tatum v. Fairstead Affordable LLC*, 2023 WL 8923400 (Del. Ch. 2023); *PJT Holdings, LLC v. Costanzo*, 339 A.3d 1231 (Del. Ch. 2025).
[45] *Metro Storage Int'l*, 275 A.3d at 879.

16

concerning a driver and that she, along with others, ignored whistleblower complaints about the workplace.

In the context of "ordinary" workplace employment contracts, the law concerning after-acquired evidence in Delaware is a good bit less clear. It does not appear that the Delaware Supreme Court has weighed in on the subject outside of the fiduciary context.

A relatively easy case is presented in situations involving "resume fraud." In *Schiavello v. Delmarva Systems Corp.,* the U.S. District Court found that under Delaware law, submission of a fraudulent resume upon which an employer makes a hiring decision that would not have been made but for the fraud may be a bar to recovery in a wrongful discharge case.[46] The fact left to be determined by a jury is whether the employee would have been terminated had the employer known about the false statements on the resume. "This requirement serves the purpose of preventing 'an employer from combing a discharged employee's record for evidence of any and all misrepresentations, no matter how minor or trivial, in an effort to avoid legal responsibility for an otherwise impermissible discharge.'"[47] So, while it is

---

[46] 61 F.Supp.2d 110, 115-16 (D. Del. 1999).

[47] *Id.* (quoting *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 549 (Colo. 1997)).

correct that the evidence of wrongdoing is "after-acquired," its salience is its fraudulent nature and the "but for" causation required.

Superior Court cases on the issue are scarce. This was recognized in *Lord v. Peninsula United Methodist Home* ("PUMH"), a case brought by a former employee alleging retaliatory discharge.[48] After the employee's termination, PUMH learned that she had secretly downloaded and copied confidential files of the employer. PUMH claimed that had it known this at the time she was terminated, she would have been fired for cause immediately.[49] The trial court, however, decided that "[e]ven if this Court were to find that the [after acquired evidence] doctrine is applicable to the matter *sub judice,* which this Court expressly declines to do at this time, a grant of summary judgment under the doctrine is only appropriate in the absence of a material factual dispute concerning whether Lord's actions warranted independent dismissal."[50] As in *Shiavello* above, the Court believed a jury should decide whether the after-acquired evidence would have caused the Plaintiff to be terminated for cause.[51]

The after-acquired evidence doctrine has obvious utility in cases where a former employee has breached his fiduciary duties or committed outright fraud in

---

[48] 2001 WL 392237 (Apr. 1, 2001).
[49] *Id.* at *2.
[50] *Id.* at *7.
[51] *Id.*

18

getting hired in the first place. But when the parties negotiate their eventual severance as part of the hiring process, there are good reasons to be circumspect in allowing the employer out of the deal. Faced with severance payments or stock options it does not wish to part with, the employer is incented to go rummaging through the employee's history to find any reason it can to announce that the termination was really for cause and the employer has no duty to honor the agreement it made.

Resolving these important policy considerations should be done on a clear record. This is not one. Defendants say they have learned things since Plaintiff's termination that are at least unflattering. But even today, almost three years since she was terminated, Defendants' affidavit says only that "Plaintiff's failure to disclose the driver's company policy violation *could* constitute grounds to retroactively terminate Plaintiff for Cause pursuant to the Employment Agreement 4(c)."[52] Well, maybe it could, maybe it couldn't. But in order to turn this veiled threat into a litigable dispute, only the Board of Directors can terminate for cause, and it has not done so.[53]

---

[52] Ryan Polk Aff. ¶16 (emphasis added).

[53] Compl., Ex. A at 5 (providing that "the Employment Period may be terminated by the Board at any time for Cause or without Cause" and "any termination of the Employment Period by the Board shall be effective as specified in a written notice from the Board to you."). "Cause" requires a good faith determination by the Board that the employee has materially breached or otherwise violated the terms of the Employment Agreement. *Id.* at 1.

As to the allegations in the civil complaint filed in April 2025, even less is stated in Defendants' affidavit, only that "[i]f these allegations are true, it *could* 'constitute Cause under the Employment Agreement.'"[54]  Should the employer have two years to contemplate whether it can abrogate its Employment Contract due to "after-acquired evidence?"  Is a tort plaintiff's bare complaint sufficient to be called "evidence" of Plaintiff's wrongdoing?  Shall we let all of this ride on the tort plaintiff's lawsuit, likely to be settled without a clear answer?  The point is not to suggest there are "material facts in dispute" but rather that the Board must act on the after-acquired evidence before that evidence is material – before that, it is just talk.

So, to review.  Defendants terminated Plaintiff's employment in January 2023 and agree that at the time, it was "without cause," thus triggering, *inter alia*, certain rights under the Employment Contract.  Some two and a half years after the fact, Defendants seek to avoid fulfilling their contractual obligations by relying upon a doctrine by which they would have the Court excuse their non-compliance due to "after-acquired evidence."  But the Board itself has not acted on this after-acquired evidence and has not recharacterized her termination as one for cause.  Had the Board done so, perhaps there would be a litigable issue on whether the after-acquired evidence was sufficient to terminate her for cause.

---

[54] Ryan Polk Aff. ¶21 (emphasis added).

20

But those are not these facts.  The Board has never recharacterized Plaintiff's termination.  The Defendants want the Court to find an issue of material fact when Defendants' own Board has not raised one.

The motion before the Court seeks summary judgment as to the liability of Peak Utility and Kelly Cable under Count 1 alleging breach of contract.  That motion is **GRANTED**.

**IT IS SO ORDERED.**

**/s/ Charles E. Butler**
Charles E. Butler, Resident Judge